## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Abdallah Al-Anazi,

                          Plaintiff,        Case No. 15-cv-12928

v.                                          Judith E. Levy
                                            United States District Judge

Bill Thompson Transport, Inc.,

                          Defendant.        Mag. Judge R. Steven Whalen

_____/

## OPINION AND ORDER GRANTING IN PART AND
## DENYING IN PART DEFENDANT'S MOTION FOR
## PARTIAL SUMMARY JUDGMENT [17]

This is a putative class action case brought under the Truth-in-

Leasing Regulations.  Pending is defendant Bill Thompson Transport,

Inc.'s ("BTTI") motion for partial summary judgment.  (Dkt. 17.)

## I.    Background

Plaintiff Abdullah Al-Anazi is a truck owner-operator who

contracted his equipment and driving services to defendant in 2014 and

2015.  On October 21, 2014, plaintiff signed a Contractor Operating

Agreement ("Operating Agreement") (Dkt. 1-1), which contained several

provisions regarding the rights and responsibilities of the parties regarding repairs to plaintiff's truck.

First, in the "Expenses" section, the contract states that "SUBCONTRACTOR UNDERSTANDS THAT HE IS NOT REQUIRED TO PURCHASE OR RENT ANY PRODUCTS, EQUIPMENT, OR SERVICES FROM BTTI AS A CONDITION OF ENTERING INTO THIS AGREEMENT." (Id. at 3.)   Appendix D to the agreement, entitled "Miscellaneous Charge Back Items," states that "BTTI, at its option, shall perform maintenance and/or repair service for the Equipment, at BTTI's option and subject to space availability." (Id. at 12.)

Under "Compensation and Payment," the agreement states that:

The parties agree that in the absence of a written notice to the other by certified mail within 90 days of the issuance of each settlement statement describing compensation under this Agreement, paid by BTTI to SUBCONTRACTOR, the settlement described in such settlement statement shall be final and binding on both parties. Neither party shall make any claim or demand of any nature on the other for matters arising out of this Agreement during the period covered by each settlement statement if no written notice of that claim or demand has been sent to the other party within 90 days of the settlement statement.

(Id. at 3.)

Plaintiff began driving for defendant on December 1, 2014, and ceased driving for defendant on May 1, 2015. From the time plaintiff signed the Operating Agreement in October 2014, to plaintiff terminating the agreement in May 2015, defendant performed numerous repairs on plaintiff's vehicle (*see generally* Dkts. 17-4, 17-6), and issued settlement statements related to those repairs. (Dkt. 17-7.)

On August 17, 2015, plaintiff filed a putative class action lawsuit alleging that defendant violated three provisions of the federal Truth-in-Leasing Act and one provision of the Michigan Motor Vehicle Repair Act. Plaintiff asserts four counts: (1) violation of 49 C.F.R. § 376.12(h) *et seq.* due to the Operating Agreement's lack of specificity regarding charge back items, (2) violation of 49 C.F.R. § 376.12(h) *et seq.* due to the requirement that maintenance and service be performed by an authorized carrier, (3) violation of 49 C.F.R. § 376.12(h) and (i) *et seq.* due to unauthorized deduction of repair and maintenance funds, and (4) violation of MCL § 257. 1301 *et seq.* for failure to comply with the Michigan Repair Act.

On November 16, 2015, defendant filed a motion for partial summary judgment seeking dismissal of Counts I, II, and IV, and a limitation on all claims under Count III to those for which proper notice was given under the Operating Agreement.  (Dkt. 17.)

## II.   Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248.  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## III.   Analysis

### A. Count I: Charge Back Specificity

Plaintiff alleges that defendant violated 49 C.F.R. § 376.12(h) of the Truth-in-Leasing Regulations because the Operating Agreement lacked specificity as to charge back items. Section 376.12 requires that:

> The lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed. The lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge.

The relevant portion of the agreement states as follows in Section 5:

> SUBCONTRACTOR agrees to pay all expenses of operations pursuant to this agreement, except as otherwise provided herein, including expenses of repair and maintenance of the equipment in the condition required by all applicable federal and state regulations; expenses of oil, fuel (including deficiencies, if any, in periodic fuel tax payments), and tires; empty mileage, except to the extent described in Appendix B; tolls, except for reimbursement by BTTI to the extent described in Appendix B; base plates, and licenses; federal highway use tax; expenses of marking the equipment, expenses of insurance to the extent prescribed in section 11; and all expenses of other persons assisting or employed by SUBCONTRACTOR, including health and pension costs, workers compensation or similar insurance or obligations. SUBCONTRACTOR agrees to pay or reimburse BTTI for those additional charges set forth in Appendix D to this agreement. . . . In the event BTTI pays any of the items set forth above, the amount thereof paid by BTTI shall be

5

deducted from the amount due SUBCONTRACTOR under this agreement.

(Dkt. 1-1 at 2.)

Appendix D lists ten miscellaneous charge back items, and states that "BTTI, at its option, shall perform maintenance and/or repair service for the Equipment, at BTTI's option and subject to space availability.  BTTI shall charge SUBCONTRACTOR for such services according to the fees then in effect at the BTTI shop for such service for vehicles not owned by BTTI."  (Id. at 12.)

Defendant argues that, pursuant to *Port Drivers Fed'n 18, Inc. v. All Saints Express, Inc.*, 757 F. Supp. 2d 463 (D.N.J. 2011) ("*Port Drivers* II"), the language of Section 5 and Appendix D is clear enough to satisfy § 376.12(h).  The *Port Drivers* court, having found that a prior charge back provision was insufficiently clear, analyzed the following provision:

> Contractor agrees that all expenses associated with the operation of its Equipment while under lease to ASE, such as, for example, repairs, maintenance, tires, fees, penalties, insurance, fuel, oil, tolls, permits, applicable taxes, etc. ["expenses"], shall be the sole obligation of the Contractor.... In the event ASE is requested by Contractor to advance moneys for expenses on behalf of Contractor, and ASE agrees to do so, Contractor authorizes ASE to withhold from

6

any moneys due Contractor the amounts advanced by ASE
for the benefit for Contractor.

*Id.* at 468.  That court found that the above provision would have been

sufficiently clear for the purposes of § 376.12(h), if "etc." was changed to

"and like items." *Id.*

In *Port Drivers Fed'n 18, Inc. v. All Saints Express, Inc.*, 757 F.

Supp. 2d 463 (D.N.J. 2011), ("*Port Drivers* I") that court interpreted the

following charge back provision:

> Contractor authorizes carrier to withhold, from any monies
> due to the contractor, any amount due for repairs or
> maintenance, gasoline, fuel, oil, labor, tires, insurance or
> merchandise purchased by [All Saints] or it's [sic] employee,
> advanced as well as any amount for which the carrier may
> be liable by failure of contractor to conform to the terms of
> this agreement, together with a service charge not exceeding
> that prescribed by law.

*Id.* at 454-55 (emphasis removed).  Plaintiffs challenged the provision

permitting the carrier to withhold money for insurance, and argued that

this did not specify how the amount of the charge-back would be

calculated.  *Id.* at 455.  The court agreed with plaintiffs, and stated that

"even if the name and amount of the charge-back is listed, the method

by which the amount of the charge-back is computed is an essential

7

component in fulfilling the requirements of 49 C.F.R. § 376.12(h)." *Id.* (citing *Owner-Operator Indep. Drivers Ass'n v. Landstar Sys. Inc.*, 541 F.3d 1278, 1292-93 (11th Cir. 2008)).

In short, the issue with the charge back provision in *Port Drivers* I was that it did not specify how certain charges would be calculated. The provision in *Port Drivers* II fixed this issue by making all of the subject charges the responsibility of the driver who formerly would have been charged. The charge back provision in this case differs because it still charges plaintiff for the ten items contained in Appendix D – including the repairs that may be performed at defendant's discretion.

Plaintiff cites other cases interpreting this provision in which defendants were found to have violated § 376.12(h). In *Owner-Operator Indep. Drivers Assoc., Inc. v. C.R. England, Inc.*, 508 F. Supp. 2d 972 (D. Utah 2007), that court found that the agreement between the parties failed to clearly specify certain charge backs against compensation and a recitation of how those charges were calculated, as well as documents necessary to determine the validity of the charge-backs. *Id.* at 981. Likewise, in *Tayssoun Transp., Inc. v. Universal Am-Can, Ltd.*, Case No. 04-1074, 2005 WL 1185811 (S.D. Tex. Apr. 20, 2005), that court

8

found that a carrier's deduction of a per-trip fee violated § 376.12(h) because the agreement between the parties did not specify how the deduction would be computed or provide copies of documents necessary to determine the charge's validity. *Id.* at *17.

In this case, it is unclear which language plaintiff is stating violates § 376.12(h), and how. Plaintiff's primary disagreement is with the language of Appendix D, which states that defendant may perform repairs at its discretion and at the rates normally charged for repairs of vehicles defendant does not own. The language of Appendix D clearly states how potential charges will be computed: at the rates normally charged for non-BTTI vehicles.

Defendant has also provided extensive copies of documentation that it states were provided to plaintiff detailing the charges assessed. Notably, plaintiff provides a notarized affidavit in support of his claims, but does not state that he did not know how deductions from his pay would be computed, or that he did not receive copies of documents to review.

The cases that plaintiff cites are unpersuasive here, because they concern agreements under which drivers were either not informed of

how charges would be computed, or not given documentation detailing the charges.    Here, plaintiff received both information regarding computation, and extensive documentation.

Accordingly, summary judgment is granted as to Count I.

## B. Count II: Maintenance and Service

Plaintiff alleges that defendant violated 49 C.F.R. § 376.12(i), which states that:

> The lease shall specify that the lessor is not required to purchase or rent any products, equipment, or services from the authorized carrier as a condition of entering into the lease arrangement. The lease shall specify the terms of any agreement in which the lessor is a party to an equipment purchase or rental contract which gives the authorized carrier the right to make deductions from the lessor's compensation for purchase or rental payments.

Plaintiff alleges that Appendix D of the Operating Agreement violates § 376.12(i). It states that "BTTI, at its option, shall perform maintenance and/or repair services for the Equipment, at BTTI's option and subject to space availability." (Dkt 1-1 at 12.)

Defendant directs the Court to the statement contained in all capital letters in section 5 of the agreement: "SUBCONTRACTOR

10

UNDERSTANDS THAT HE IS NOT REQUIRED TO PURCHASE OR RENT ANY PRODUCTS, EQUIPMENT, OR SERVICES FROM BTTI AS A CONDITION OF ENTERING INTO THIS AGREEMENT." (*Id.* at 3.)  Defendant argues that this clause is dispositive under § 376.12(i). It interprets the relevant section of Appendix D to mean only that it "has reserved the option to refuse to perform repairs on Plaintiff's vehicle if it chooses to." (Dkt. 17 at 20.)

Plaintiff argues that § 376.12(i) imposes a substantive, as well as linguistic, obligation on defendant.  First, the prefatory language of § 376.12 states that "[t]he required leave provisions shall be adhered to and performed by the authorized carrier."  Second, plaintiff points to Seventh Circuit case law indicating that this language imposes a substantive obligation on a carrier to actually comply with the required contractual terms, not just include them in an agreement.  *See Mervyn v. Nelson Westerberg, Inc.*, 76 F. Supp. 3d 715, 719 (N.D. Ill. 2014) (citing *Owner-Operators Indep. Drivers Ass'n v. Mayflower Transit, Inc.*, 2006 WL 1547084, at *5 (S.D. Ind. June 1, 2006)); *Owner-Operator Indep. Drivers Ass'n v. Mayflower Transit, LLC,* 615 F.3d 790 (7th Cir. 2010).  The Court finds this precedent persuasive.

11

When section 5 and Appendix D are read in concert, the language of the Operating Agreement does not, on its face, violate § 376.12(i). Section 5 lists a variety of charges that are the driver's responsibility, and incorporates Appendix D to reference other specific charges that the driver may have to pay. Section 5 governs Appendix D, and so the disclaimer that the driver is not required to rent or purchase services governs the interpretation of the language permitting defendant to perform certain services at its option.

However, a substantive obligation also exists under § 376.12(i). The language of the Operating Agreement must comport with § 376.12(i), but so must defendant's conduct under the Operating Agreement. Defendant argues only that the language of the contract establishes compliance with the law, but not that it *actually complied* with the law. The parties also present competing affidavits regarding defendant's compliance with the law (Dkt. 17-2; Dkt. 20-3.) This creates a genuine issue of material fact regarding defendant's compliance.

Accordingly, summary judgment is denied as to Count II.

### C. Count III: Unauthorized Deduction

12

Plaintiff alleges that defendant materially violated 376.12(h) and (i) by taking unauthorized deductions from plaintiff under the Operating Agreement. Defendant moves for partial summary judgment on this claim, arguing that the notice provision in the Operating Agreement bars all claims for which notice was not given within ninety days. The relevant language states that:

> The parties agree that in the absence of a written notice to the other by certified mail within 90 days of the issuance of each settlement statement describing compensation under this Agreement, paid by BTTI to SUBCONTRACTOR, the settlement described in such settlement statement shall be final and binding on both parties. Neither party shall make any claim or demand of any nature on the other for matters arising out of this Agreement during the period covered by each settlement statement if no written notice of that claim or demand has been sent to the other party within 90 days of the settlement statement.

(Dkt. 1-1 at 3.)

Plaintiff makes two arguments regarding the enforceability of this provision. First, plaintiff argues 49 U.S.C. § 14705 creates jurisdictional rights and deadlines for an owner-operator under the Truth-in-Leasing Regulations, and as such, cannot be contractually

modified. (Dkt. 27 at 8-9.) Second, plaintiff argues it is against public policy to enforce the provision.

Section 14705 establishes a statute of limitations for claims to be brought under the Truth-in-Leasing Regulations. In cases such as this, plaintiff "must begin a civil action to recover overcharges within 18 months after the claim accrues." 49 U.S.C. § 14705(b). Whether a statute of limitations is jurisdictional is determined by Congress, and the Supreme Court has held that "the Government must clear a high bar to establish that a statute of limitations is jurisdictional." *United States v. Kwai Fun Wong*, ___ U.S. ____, 135 S. Ct. 1625, 1632 (2015). In order to meet this bar, Congress must do more than establish time restraints for filing a civil suit. While Congress need not use any "magic words," it must clearly state when a statute of limitations is intended to be jurisdictional. *Id.* at 1633.[1]

The Supreme Court has "made plain most time bars are nonjurisdictional" and "described filing deadlines as quintessential claim-processing rules, which seek to promote the orderly progress of litigation, but do not deprive a court of authority to hear a case." *Id.*

---

[1] This is called the "clear statement rule." *Kwai Fun Wong*, ___ U.S. ____, 135 S. Ct. at 1632.

14

(internal quotation marks and further citation omitted).  Plaintiff does not attempt to differentiate the time bars in 49 U.S.C. § 14705 from typical, nonjurisdictional statutory time bars.   Instead, plaintiff's argument assumes that this statutory time bar is jurisdictional in nature because it grants parties the ability to file an administrative complaint for an additional eighteen months after the statute of limitations for a civil action ends.  (Dkt. 27 at 8-9.)

Congress did not express a clear intention for the time bars limiting claims under the Truth-in-Leasing Regulations to be jurisdictional in nature.  Congress may establish that a time bar is jurisdictional in nature by using language that either explicitly discusses the power of the courts or discusses the statute of limitations requirement alongside a requirement that any action arising under the statute must be brought in federal court.  *Kwai Fun Wong*, 135 S. Ct. at 1633.

49 U.S.C. § 14705 meets neither of these standards, and also fails under the clear statement rule.  For example, 49 U.S.C. § 14705(b) reads that "[claimant] must begin a civil action to recover overcharges within 18 months after the claim accrues," but does not state that this

statute of limitations for a civil action is intended to be jurisdictional. Because § 14705 does not create a jurisdictional time bar, plaintiff's argument that the statute of limitations is automatically unable to be waived or extended by the parties or the court is without merit.

With regard to plaintiff's second argument, Congress did not include any explicit prohibitions regarding contractual modifications of the statute of limitations when writing the Truth-in-Leasing Regulations. Congress' silence on this topic does not mean it approved of contractual modifications of the statute of limitations under the Truth-in-Leasing Act, but it does show that there is no explicit ban to such modifications on the face of the Regulations.

The Federal Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") is an example of Congress explicitly prohibiting contractual modifications of statutory statute of limitations. FIRREA adopted statute of limitation periods proceeded by the statement "[n]otwithstanding any provision of any contract." 12 U.S.C.A. § 1821. With this short phrase, Congress "precluded the application of a shorter contractual limitations period." Jett Hanna, <u>Statute of Limitations Issues in FDIC and Rtc Claims Against Attorneys Representing Failed</u>

Financial Institutions, 12 Rev. Litig. 619, 637 (1993); *see also Resolution Trust Corp. v. Krantz*, 757 F. Supp. 915, 920 (N.D. Ill. 1991) (finding that contract provisions attempting to shorten the statute of limitations provided in FIRREA were unenforceable.)

The Ninth Circuit in reviewing the Truth-in-Leasing Regulations, determined that "Congress's substantive purpose in authorizing the Truth–in–Leasing regulations was to protect owner-operators." *Owner Operator Indep. Drivers Ass'n v. Swift Transp. Co. (AZ)*, 367 F.3d 1108, 1115 (9th Cir. 2004). Contractual provisions further restricting owner-operators' ability to file suit contravene this purpose. Rather than protecting owner-operators, such contract modifications allow motor carriers, who are typically in superior bargaining positions, to restrict owner-operators's ability to file suit.

Defendant argues it is a "bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy." *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 51 (2003). Accordingly,

defendant argues that the ninety-day notice provision should be enforced just as it would be in the insurance industry.

Notice provisions in insurance contracts enable insurers to "make a timely investigation in order to protect [their] interests." *Weller v. Cummins*, 330 Mich. 286, 293 (1951). Here, defendant has no investigation to carry out and no evidence to collect. Defendant is the party that performed maintenance on plaintiff's truck and charged him for it. To the extent that defendant must investigate anything, it would investigate the repair receipts, invoices, and checks it created and distributed. Defendant does not need to ensure the preservation of evidence for a timely investigation, because it possesses the evidence to be investigated. Extending this principle to defendant in this case would be unwarranted.

Plaintiff argues that enforcing the notice provision would violate public policy because courts have held similar contractual provisions to be unenforceable under other federal statutory schemes meant to protect workers' rights. Plaintiff first cites *Lewis v. Harper Hospital*, a Family Medical Leave Act ("FMLA") case in which the court found that a "six month limitation clause [on FMLA claims] is not enforceable."

18

*Lewis*, 241 F.Supp.2d 769, 773 (E.D. Mich. 2005).  This was so because the FMLA explicitly prohibited employees from waiving their rights under FMLA.  *Id*; 29 C.F.R. § 825.220(d).

Plaintiff also cites *Wineman v. Durkee Lakes Hunting & Fishing Club Inc.*, 352 F.Supp.2d 815, 822 (E.D. Mich. 2005), in which the court held that an employee could not waive the Fair Labor Standards Act ("FLSA") statute of limitations because allowing an employee to do so would be contrary to public policy:

> In this case, the defendant argues that it is not seeking a waiver of the employees' substantive rights under the FLSA, but rather procedural rights represented by the statute of limitations.  In light of the public policy implications, however, that is a *distinction without a difference*.  The Supreme Court has held that other procedural rights under the FLSA, such as the right to bring claims in court rather than in an arbitral forum, cannot be waived.

*Id.* (emphasis added).

Much like the Truth-in-Leasing Regulations, the FLSA was intended by Congress to help employees by giving them "fundamental workplace rights."  *Id.* at 821.  The *Wineman* court further stated:

> [T]he right to enforce these privileges in court, was intended "to achieve a uniform national policy of guaranteeing compensation for all work or employment engaged in by

19

> employees covered by the Act. *Any custom or contract falling short of that basic policy,* like an agreement to pay less than the minimum wage requirements, *cannot be utilized to deprive employees of their statutory rights."*

*Id.* (emphasis added in original) (quoting *Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers,* 325 U.S. 161, 176 (1945)).  It is both unwise and incorrect to divorce procedural from substantive rights in employee rights cases.  Further, deference should be paid to Congress when it has specifically created "the right to enforce these privileges in court."  *Wineman*, 352 F.Supp.2d at 821.  Importantly, *Wineman* also recognizes that despite the statutory language differences between the FMLA and the FLSA, the holding in *Lewis* is still relevant.

> Although there is no concomitant regulation pertaining to the FLSA, the holding in *Lewis* is significant in that the court proclaimed that "imposing a six month statute of limitation is an interference with employees' rights under the FMLA where the statute of limitations is either two or three years."   Likewise, the six-month contractual adjustment of the two- and three-year statute of limitations in this case constitutes a compromise of the employees' rights under the FLSA.

*Id.* at 822-23.  Much like the FLSA, the Truth-in-Leasing Regulations have no explicit statutory language barring the protected class from waiving their rights.   However, the *Wineman* analysis is equally

20

persuasive here—public policy weighs strongly in favor of preventing contractual limitations on the ability of plaintiffs to bring suit to protect rights otherwise guaranteed by the Truth-in-Leasing Regulations.[2]

Accordingly, summary judgment is denied as to Count III.

### D. Count IV: Michigan Repair Act

Plaintiff alleges that defendant violated the Michigan Repair Act, M.C.L. § 257.1301 *et seq.*, by engaging in deceptive practices.  Namely, plaintiff alleges that defendant violated §§ 257.1332 and 257.1334.  In relevant part, § 257.1332 states that:

> (1) A motor vehicle repair facility shall give to the customer a written estimate, itemizing as closely as possible the price for labor and parts necessary for a specific job prior to the commencement of work. A facility shall not charge for work done or parts supplied in excess of the estimated price or in excess of the limit stated by the customer in the waiver provided for in subsection (3) without the knowing written or oral consent of the customer which shall be obtained at some time after it is determined that the estimated price or stated

---

[2] Defendant's argument that the ninety-day provision does not improperly affect the statute of limitations is irrelevant due to the public policy issues the notice provision raises. In a Massachusetts case defendant cites, that court upheld a notice requirement stating "[plaintiff] cites to no other authority and suggests no other basis on which the aforesaid notice provision would *contravene public policy* or otherwise be unenforceable." *Puleio v. N. Coast Sea-Foods Corp.*, 934 N.E.2d 302 (2010) (emphasis added).  The present case is the sort *Puleio* anticipated as contravening public policy, and accordingly the *Puleio* case's holding is inapplicable here.

limit is insufficient and before any work not estimated or in excess of the limit is done or the parts not estimated or in excess of the limit are supplied. If a waiver is not signed as provided in subsection (3) and the estimated price is exceeded by not more than 10% or $10.00 whichever is lesser, the written or oral consent of the customer for the excess charge need not be obtained unless specifically requested by the customer. This section shall not be construed as requiring a motor vehicle repair facility, mechanic, or mechanic trainee to give a written estimated price if he agrees not to perform the requested repair. If the actual cost of repair is less than the agreed upon estimated cost, the customer shall pay only the actual cost.

(2) If the facility or mechanic informs the customer that the price for repair will exceed the written estimate or the stated limit in the waiver and the customer does not want the repair work performed then the customer is liable for all reasonable costs to return the vehicle to the condition it was when it entered the facility. These costs should be indicated in written form itemizing the costs as closely as possible with a copy given to the customer. The cost of a diagnosis to be made, whether or not the customer authorizes repairs to be performed, shall be contained in the written estimate before the diagnosis is undertaken.

Section 257.1334 states that:

A motor vehicle repair facility, including a gasoline service station which performs any of the repairs listed in the repair categories of certification for specialty mechanics or developed by the administrator by rule, shall give to each

22

customer a written statement upon return of the repaired vehicle to the customer. The statement shall disclose:

(a) Repairs needed, as determined by the facility.

(b) Repairs requested by the customer.

(c) Repairs authorized by the customer.

(d) The facility's estimate of repair costs.

(e) The actual cost of repairs.

(f) The repairs or services performed, including a detailed identification of all parts that were replaced and a specification as to which are new, used, rebuilt, or reconditioned.

(g) A certification that the repairs were completed properly or a detailed explanation of an inability to complete repairs properly. The statement shall be signed by the owner of the facility or by a person designated by the owner to represent the facility. The name of the mechanic or mechanics who performed the diagnosis and the repair shall also appear on the statement.

Section 257.1302(g) defines a "motor vehicle repair facility" as:

[A] place of business which engages in the business of performing or employing persons who perform maintenance, diagnosis, vehicle body work, or repair service on a motor vehicle for compensation, but excluding all of the following:

23

(i) A person who engages only in the business of repairing the motor vehicles of a single commercial or industrial establishment or governmental agency.

(ii) A person repairing his or her own or a family member's car.

(iii) A business that does not diagnose the operation of a motor vehicle, does not remove parts from a motor vehicle to be remachined, and does not install finished machined or remachined parts on a motor vehicle, not including a motor vehicle repair facility that engages in the business of performing or employing persons who perform vehicle body work.

Defendant argues that the Michigan Repair Act does not apply to it, because it repairs only vehicles that it owns or has full control over pursuant to federal law within the scope of its business dealings, and is thus exempt under the Repair Act's first exemption for an entity that only repairs the vehicles of a single commercial establishment.  Plaintiff argues that because he owns his truck, this exemption is not applicable to defendant because the motor vehicle does not belong to defendant and is therefore not the vehicle of a single commercial establishment.

Michigan case law is silent as to whether a common carrier who leases a vehicle from a third party, to be used solely in the common carrier's operations, is exempt under the Michigan Repair Act.  The

24

Repair Act states that "[a] person who engages only in the business of repairing the motor vehicles of a single commercial or industrial establishment or governmental agency" is excluded from the Act. M.C.L. § 257.1302(g)(A)(i).

Defendant cites various federal regulations defining the relationship between owner-operators and carriers in support of the proposition that it is exempt from the Michigan Repair Act. These regulations, defendant argues, establish that when defendant repairs the trucks of owner-operators it employs, it is doing so in service of a single commercial establishment that has exclusive control over the owner-operators' vehicles.

Defendant first relies on the definitions section of the Federal Motor Carrier Safety Regulations ("FMCSR"), 49 C.F.R. § 390.5, which define defendant as an employer and define plaintiff, "an independent contractor while in the course of operating a motor vehicle," as an employee of defendant. Defendant next relies on other sections of the FMCSR that define owner-operators as "drivers" over whom defendant would have responsibility. *See* 49 C.F.R. §§ 382.107 (owner-operators are "drivers" along with regularly employed, casual, and leased drivers

for the purpose of a motor carrier's controlled substance and alcohol use testing responsibilities), 390.11 (motor carrier is obligated to ensure that its drivers, including owner-operators, observe all duties and prohibitions imposed on them).

Defendant also argues that, under the FMCSR, it is defined as an "owner" of the owner-operator's equipment because, despite not having title to the vehicle, it "has the right to exclusive use of [the] equipment." 49 C.F.R. § 376.2(d)(2); *see also* 49 C.F.R. § 376.12(c)(1) (stating that "the lease [between the owner-operator and trucking company as authorized carrier lessee] shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease," and that the authorized carrier lessee "shall assume complete responsibility for the operation of the equipment for the duration of the lease.").[3]

For the purposes of the Michigan Repair Act, these federal regulations establish that carriers such as defendant are required to assume broad, even absolute, responsibility for both owner-operators and their equipment.  This extends to the legal requirement, expressed

---

[3] The Operating Agreement contains a clause stating that defendant, "[t]o the extent required by applicable regulations . . . shall assume possession, control, use of and responsibility for the Equipment, during this Agreement."  (Dkt. 1-1 at 2.)

26

in both 49 C.F.R. § 376.12(c)(1) and the Operating Agreement, that carriers such as defendant have exclusive possession, control, and use over the equipment.   For this reason, a carrier such as defendant repairs the vehicles of a "single commercial . . . establishment" when it repairs the vehicles of the owner-operators it employs, such as plaintiff. M.C.L. § 257.1302(g)(A)(i).

This is so because the defendant is required to exercise a degree of control and responsibility over the equipment as a matter of law such that the vehicle is a part of its commercial establishment during the period defendant employs the owner-operator.   That the owner-operator may terminate this relationship and with it defendant's control over his vehicle does not change this analysis, because while the contractual relationship is still in force, defendant is required to assert exclusive possession, control, and use over the vehicle.

Accordingly, summary judgment is granted as to Count IV.

## IV.   Conclusion

For the reasons stated above, it is hereby ordered that:

Defendant's motion for partial summary judgment (Dkt. 17) is GRANTED as to Counts I and IV and DENIED as to Counts II and III.

27

IT IS SO ORDERED.

Dated: July 6, 2016                    s/Judith E. Levy
Ann Arbor, Michigan                    JUDITH E. LEVY
                                       United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 6, 2016.

                                       s/Felicia M. Moses
                                       FELICIA M. MOSES
                                       Case Manager